## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| MARRIOTT HOTEL SERVICES, INC.<br>10400 Fernwood Road<br>Bethesda, MD 20817 | ) ) ) |
|     Plaintiff, | ) ) ) |
| v. | )    Civil Action No. |
| WARDMAN HOTEL OWNER, L.L.C.<br>4747 Bethesda Avenue, Suite 200<br>Bethesda, MD 20814 | ) ) ) ) |
| PACIFIC LIFE INSURANCE COMPANY<br>700 Newport Center Drive<br>Newport Beach, CA 92660 | ) ) ) ) |
|     Defendants. | ) ) |

## COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES

1.    This case arises from the decision of a hotel owner and lender to take advantage of the global coronavirus pandemic to avoid their financial obligations, attempt to close an iconic local hotel, and thereby breach long-term contracts with detrimental consequences for the entire community.

2.    The Hotel at issue is the Washington Marriott Wardman Park (the "Hotel"), the historic convention hotel situated in Woodley Park, Washington, D.C. The Hotel is owned by an entity known as Wardman Hotel Owner, L.L.C. ("Owner"), which is itself owned by an affiliate of JBG SMITH Properties

1

("JBG") and an affiliate of Pacific Life Insurance Company ("PacLife"). PacLife is also the Owner's lender on the Hotel's mortgage.

3.      The Owner contracted with Marriott to manage the Hotel pursuant to a long-term management agreement. Under that agreement, Marriott lends the Hotel its name, its employees, its loyal global customer base, access to its worldwide reservation system, its skilled management services, and its reputation, in exchange for management fees and the Owner's agreement to fund all of the Hotel's expenses.

4.      Nearly forty years remain on the management agreement, but the Owner and lender want to end it prematurely, shutter the Hotel, and redevelop it as high-end residences. The Owner has publicly admitted that there is no equity value in the Hotel, and that all of the value lies in its debt—which is also owned by PacLife. Marriott has attempted to work with the Owner to negotiate a mutual termination agreement, at Owner's request, that includes payment of a termination fee to compensate Marriott for the decades' worth of management fees it would be giving up. But those talks have stopped, and the Owner and PacLife are now attempting to force Marriott out without compensation—and indeed, at great expense and harm.

5.      The Owner does not dispute that there is presently a need for material capital contributions for the Hotel. Nor does the Owner dispute that it is Owner's

2

obligation to make those contributions under the management agreement. Yet for the past several months, the Owner has been shirking these obligations, including the obligation to pay for day-to-day expenses of the Hotel. As a result, *Marriott* has been forced to shoulder millions of dollars in costs to ensure that the Hotel's employees do not lose their benefits, the Hotel property remains secure from vandals and thieves, and the Hotel does not face other serious liabilities. The Owner and lender's strategy appears to be: starve the Hotel of working capital funds needed to pay expenses of the Hotel in hopes that Marriott will be forced to either make payments or walk away.

6. Marriott has invested decades into the management of the property, established relationships with groups and guests it might otherwise have booked elsewhere, and created ties to the community, all based on the long-term nature of its agreement with the Owner.

7. The Owner is obligated to fund the Hotel in order to pay its expenses. Its refusal to do so is causing Marriott harm, both financial and reputational. Accordingly, Marriott has been left with no choice but to file this action seeking to compel the Owner and PacLife to perform their contractual obligations to Marriott without interference—specifically, to fund the Working Capital that Marriott has repeatedly requested over the past six months and will need in the months to come.

## **PARTIES, JURISDICTION, AND VENUE**

3

8.    Plaintiff Marriott Hotel Services, Inc. ("Marriott") is a Delaware corporation with its principal place of business located in Bethesda, Maryland.

9.    Marriott is a leading hospitality company that operates thousands of hotel properties worldwide, and manages a portfolio of thirty distinct, innovative, and award-winning brands.  Marriott's portfolio includes some of the most well-known and highly respected hotel brands, such as the luxury brands The Ritz-Carlton and St. Regis, the premium brands Marriott and Sheraton, and the select brands Courtyard and Four Points.

10.    Defendant Wardman Hotel Owner, L.L.C. ("Owner") is a Delaware limited liability company with a registered address in Chevy Chase, Maryland.

11.    Three companies comprise the Owner.  JBGS/Company Manager, L.L.C. is a Delaware limited liability company with its principal place of business in Chevy Chase, Maryland.  It owns 0% of the Owner and is the Managing Member.  PL Wardman Member, LLC is a Delaware limited liability company with its principal place of business in Newport Beach, California.  It owns 80% of the Owner.  And JBGS/CIM Wardman Owner Member, L.L.C. is a Delaware limited liability company with its principal place of business in Chevy Chase, Maryland.  It owns 20% of the Owner.

12.    Defendant Pacific Life Insurance Company ("PacLife") is a Nebraska corporation with its principal place of business located in Newport Beach,

4

California. PacLife is the indirect parent of PL Wardman Member, LLC. PacLife has regularly called Marriott, directed correspondence to Marriott, and transacted business with Marriott at Marriott's headquarters in Bethesda, Maryland. As set forth below, PacLife also has contracted with Marriott to perform services at Marriott's corporate headquarters in Maryland. PacLife has caused tortious injury to Marriott by its acts and omissions in Maryland as set forth in this Complaint, and PacLife derives substantial revenue from services provided by Marriott at Marriott's corporate headquarters in Maryland.

13.    This Court has jurisdiction over this action pursuant to Md. Cts. & Jud. Proc. § 1-501.

14.    This Court may exercise personal jurisdiction over the Owner pursuant to Md. Cts. & Jud. Proc. §§ 6-102 and 6-103, and it may exercise personal jurisdiction over PacLife pursuant to Md. Cts. & Jud. Proc. § 6-103.

15.    Venue is proper in this Court under Md. Cts. & Jud. Proc. § 6-201 because the Owner resides in Montgomery County and carries on a regular business in Montgomery County, and under Md. Cts. & Jud. Proc. § 6-202(3) because Marriott resides in Montgomery County.

## FACTUAL ALLEGATIONS

**A. Marriott Commences Management of the Washington Marriott Wardman Park Hotel.**

16.    The Hotel has a long and storied history.  It originally opened in 1918, just days after the Armistice with Germany ending World War I and in the midst of the Spanish flu pandemic.  In 1984, its Wardman Tower wing was added to the National Register of Historic Places.  Over the years, the Hotel has undergone many changes and renovations, but since the 1950s has operated as a full-service convention hotel—one of the largest in the region.

17.    Marriott began managing the Hotel in 1998 under a management agreement with a different owner entity, before the Owner purchased the Hotel.

18.    The Hotel has long been positioned as a convention hotel, and it attracts major meetings and events of all types.  It brings tremendous tourism and economic value to the region.  Until March 2020, it also employed 731 people, including more than 500 members of the Local 25 Union (the "Union").

**B. The Management Agreement between Marriott and the Owner.**

19.    After the Owner purchased the Hotel, Marriott and the Owner executed the Second Amended and Restated Management Agreement on July 1, 2005 ("MA" or "Management Agreement").   The Management Agreement provides for Marriott to manage the Hotel for an initial term running to December 28, 2029, with automatic renewals for three additional ten-year terms unless Marriott elects not to do so.  MA §§ 1.01, 2.01.

20. Under the Management Agreement, Marriott has "exclusive supervision and control" of the Hotel and assumes responsibility for the Hotel's "proper and efficient operation." MA § 1.02(B).

21. Consistent with that level of control, the Management Agreement states that, as Manager of the Hotel, Marriott acts solely as an independent contractor, not as the Owner's partner, joint venturer, or agent. MA § 11.03.

22. As Manager, Marriott recruits, employs, supervises, directs, and discharges the Hotel's employees; arranges for and supervises Hotel public relations and advertising; prepares the Hotel's marketing plans; procures all inventory and replacement dining ware, uniforms, and other supplies used in the Hotel's public spaces and guest rooms; and plans, executes, and supervises Hotel repairs and management, and purchases of Hotel furniture, fixtures, appliances, computers, and other equipment. MA § 1.02(A).

23. Marriott also allows the Hotel to be part of the Marriott system, giving the Owner access to its hundreds of millions of loyal customers, well-honed sales and revenue management processes, and strong reputation for superior customer service. The Owner furthermore receives services available to other Marriott-branded hotels, including Marriott's national reservation system, sales office services, and payroll and accounting services; central training services, advertising

7

and promotion; career development and relocation of management personnel, benefits administration, and gift shop merchandise handling. MA § 1.03.

24.    As payment for its services under the Management Agreement, Marriott receives a Base Management Fee, which is a percentage of the Hotel's gross revenues, as well as an Incentive Management Fee, which Marriott earns only when certain available cash flow targets are achieved. MA § 3.01; *see also* Seventh Amendment to MA § 8(b) (amending the Base Management Fee and Incentive Management Fee); Fifteenth Amendment to MA § 3 (amending the Base Management Fee).

25.    The Management Agreement is clear that the Owner receives all of the Hotel's profits, apart from the Incentive Management Fee that Marriott can earn. MA § 3.02. In turn, the Owner assumes responsibility for all of the financial costs of operating the Hotel.

26.    The Management Agreement states that Marriott "shall not be obligated to incur any liability or obligation with respect to the Hotel," and "shall not be required to make any advance or payment with respect to the Hotel" except out of the Hotel's funds from operating the Hotel, petty cash funds, or Working Capital. MA § 4.03(B). "Debts and liabilities" incurred by Marriott from operating and managing the Hotel "will be paid by Owner," if the Hotel's gross revenues do not cover them. MA § 4.03(C).

27.    The Management Agreement defines "Working Capital" as:

> funds that are used in the day-to-day operation of the business of the Hotel, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain [food and beverage provisions, other merchandise intended for sale, fuel, mechanical supplies, stationery, and other expensed supplies and similar items], less accounts payable and accrued current liabilities.

MA § 12.01.

28.    The Management Agreement states that Marriott may request Working Capital from the Owner, and the Owner shall "promptly, but no later than ten (10) days after written request by Manager, advance any additional funds necessary to maintain Working Capital at levels **determined by Manager** to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require consistent with the approved Annual Operating Projection or as a result of 'unforeseen circumstances,'" including unforeseen economic and market conditions. MA § 4.05.

29.    The Management Agreement does not give the Owner the right to refuse to fund Working Capital because of a unilateral assertion that the amount Marriott seeks is unreasonable.

9

30.    If the Owner fails to fund Working Capital within ten days of Marriott's request, Marriott "shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to the funds requested by Manager for additional Working Capital from future distributions of funds otherwise due to Owner." MA § 4.05.

31.    The Management Agreement also provides Marriott with other remedies in the event the Owner fails to fund Working Capital.   Specifically, Marriott possesses remedies if the Owner commits an Event of Default, which occurs from, among other things, "[t]he failure of either party to make any payment required to be made in accordance with the terms of this Agreement, as of the due date as specified in this Agreement."  MA § 9.01(D).  When an Event of Default occurs, the non-defaulting party may "institute forthwith any and all proceedings permitted by law or equity including, without limitation, actions for specific performance and/or damages." MA § 9.02.

32.    Furthermore, the Management Agreement provides that the remedies of a non-defaulting party "shall not be in substitution for, but shall be in addition to any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity and shall survive Termination." MA § 9.03(E).

10

33.    Marriott and the Owner are both business entities with substantial experience with hotel management agreements, and each fully participated in the Management Agreement's negotiation and drafting.  MA § 11.18.

### C. The Subordination, Non-Disturbance and Attornment Agreement between Marriott and PacLife.

34.    PacLife issued a Mortgage to the Owner for the purchase of the Hotel in the amount of $230 million.   In 2010, PacLife and Owner modified the Mortgage and the debt was raised to $250 million. In 2018, PacLife and the Owner restructured the debt and PacLife entered into a new Mortgage with the Owner to reduce its debt to $122,500,000 in exchange for PacLife taking a 66.66% equity interest in the Hotel through an affiliate.  In June of 2020 Marriott was made aware that PacLife currently has an 80% equity interest in the Hotel.

35.    In connection with the last refinancing of the Owner's debt, PacLife entered into a Subordination, Non-Disturbance and Attornment Agreement with Marriott ("SNDA").  The SNDA became effective on January 19, 2018.  SNDA at 2.

36.    The SNDA was intended to effectuate Marriott's and PacLife's shared "desire to provide for [Marriott's] continued management of the Hotel pursuant to the Management Agreement notwithstanding any default by Owner under the Mortgage or the Management Agreement and after any Foreclosure…."  SNDA at 2.

11

37.   The SNDA acknowledged that the Owner's mortgage, held by PacLife, indebted the Owner to PacLife "in the original principal amount of One Hundred Twenty-Two Million Five Hundred Thousand Dollars." SNDA at 3. As security for this indebtedness, the Owner collaterally assigned to PacLife "all of Owner's right, title and interest in and to the Management Agreement." SNDA at 7.

38.   In executing the SNDA, PacLife affirmed that it was aware of the terms of the Management Agreement between Marriott and the Owner. SNDA at 2, 3, 5.

39.   Under the SNDA, if the Owner defaults on its obligations under the Management Agreement, Marriott must provide notice to PacLife, which may cure the Owner's default. SNDA at 6-7.

40.   The Owner is not permitted to terminate the Management Agreement without PacLife's prior written consent. SNDA at 7.

41.   The SNDA describes what happens with respect to the Management Agreement in the event of a Foreclosure.  Foreclosure is defined to include "without limitation," not only "transfer by judicial foreclosure," "transfer by deed in lieu of foreclosure," among other things, but also "a transfer of *either* ownership *or control of the Owner*, by exercise of a stock pledge *or otherwise*." SNDA at 3 (emphasis added). An "individual or entity that acquires title to *or control* or

12

possession of the Hotel at or through a Foreclosure (together with any successors or assigns thereof)" is the "Subsequent Owner." SNDA at 4. The SNDA mandates that "[i]n the event any Subsequent Owner comes into possession of or acquires title to or possession *or control of the Hotel* either at or following a Foreclosure," then "(i) [PacLife] and all Subsequent Owners shall recognize [Marriott]'s rights under the Management Agreement ... (iii) [Marriott] shall not be disturbed in its right to manage and operate the Hotel pursuant to the provisions of the Management Agreement, (iv) all Subsequent Owners will assume all obligations of 'Owner' under the Management Agreement that continue or arise after the Foreclosure Date, other than as expressly set forth in Section 12 of this Agreement, and (v) all Subsequent Owners will execute and deliver to [Marriott] an assumption agreement of the Management Agreement reasonably acceptable to [Marriott] within 20 days after the Foreclosure Date." SNDA at 4.

42.    The Subsequent Owner therefore has an obligation to "recognize [Marriott's] rights under the Management Agreement"; refrain from "disturb[ing] Marriott] in its right to manage and operate the Hotel pursuant to the provisions of the Management Agreement"; and "assume all obligations of [the Owner] under the Management Agreement," that continue or arise after the date of foreclosure, other than the Owner's duty to pay Base Management or Incentive Management fees unpaid as of the Foreclosure Date. SNDA at 4, 10.

13

43.    The SNDA also contemplates that PacLife may act as "Owner" under the Management Agreement *prior to* a Foreclosure and that, in so doing, PacLife assumes all obligations of the Owner under the Management Agreement. Specifically, the SNDA states that PacLife "shall, commencing on the date the Mortgagee acts as 'Owner' under the Management Agreement until the Foreclosure Date, act in a manner that is commercially reasonable and pursuant to the provisions of the Management Agreement." SNDA at 5.

### D. The Owner Has Long Wanted to Close the Hotel and Therefore Has Failed to Invest In It.

44.    The Owner has wanted to close down the Hotel since long before the COVID-19 pandemic began.

45.    In or about 2013, the Owner embarked on a plan to remove at least 181 guest rooms from the Wardman Tower section of the Hotel and turn them into residences.  With Marriott's cooperation, the Owner replaced these rooms with luxury condominiums reported to range in price from $2 million to $9 million.[1]

46.    This three-year condominium conversion project left the Hotel with substantially fewer rooms than it had before, and it removed rooms from the most historic and sought-after portion of the Hotel.  This negatively impacted Marriott's

---

[1] Michael Neibauer, *What Will Replace the Marriott Wardman Park? JBG Has a Plan, and It's Huge*, Washington Bus. J. (June 23, 2016), https://www.bizjournals.com/washington/breaking_ground/2016/06/what-will-replace-the-marriott-wardman-park-jbg.html.

ability to book the Hotel's core clientele—large groups. But the Owner has reaped significant financial benefits from the sale of the luxury condos it developed in place of the eliminated rooms.

47.   In 2016, the Owner filed paperwork with the Zoning Commission in pursuit of a redevelopment plan that would require the Hotel to close. The Owner also appeared at community meetings to present this plan, and the plan was widely reported in the press.[2]

48.   On numerous occasions, Marriott asked the Owner to stop publicly pursuing its plan to close the Hotel, but the Owner ignored those requests. Instead, the Owner continued to take public actions and make public statements in support of closing the Hotel without Marriott's consent, and even though the Management Agreement gave Marriott the option to continue operating the Hotel for approximately 40 more years.

49.   Though the Owner did not follow through on its plan to close the Hotel at that time, its publicly-reported redevelopment plan generated lasting uncertainty around the Hotel's future, materially harming the Hotel's performance during and after 2016. The perceived risk of the Hotel closing made attracting new

---

[2] *See, e.g.*, Michael Neibauer, *Woodley Park Neighbors Respond to JBG's Wardman Park Plan. Hint: They're Not Happy*, Washington Bus. J. (June 24, 2016), https://www.bizjournals.com/washington/breaking_ground/2016/06/woodley-park-neighbors-respond-to-jbgs-wardman.html (describing the "proposal to build new residential on the grounds of the Wardman Park Marriott, eventually replacing the hotel itself"); Neibauer, *What Will Replace the Marriott Wardman Park? supra* (describing the "master plan" to make the property "entirely residential").

business for the Hotel, and retaining existing business, more difficult for Marriott. This was especially true with respect to large groups, which frequently book years in advance for conventions and major events; uncertainty about the Hotel's future as a hotel created obstacles for Marriott to overcome in selling the Hotel to those groups.

50.    At the request of the Owner, the Owner and Marriott have periodically engaged in discussions about voluntarily terminating the Management Agreement. But to do so, the Owner would need to pay Marriott a significant termination fee, as prematurely closing the Hotel would deprive Marriott of nearly forty additional years of management fees it is contractually entitled to earn.  Accordingly, all of the discussions about a voluntary termination have included discussion of a significant fee paid to Marriott and Owner's payment of related costs, such as those required to relocate or terminate large group contracts.

51.    Given its desire to redevelop the Hotel, the Owner has failed to invest in the property in a way that would allow it to thrive in the marketplace.  Indeed, over the 15 years this Owner has owned the Hotel, Marriott has made numerous recommendations for crucial renovations that the Owner has refused to fund.

52.    The declining quality of the Hotel has not been lost on its guests, who have complained that the Hotel is dated and in need of renovation.  For example, guests have recently commented: "My guestroom was old and dingy;" "Our guest

16

rooms are worn and dated;" "My completely renovated room really wasn't;" and "I was in the newly renovated tower and it was just 'meh' at best."

53.    As another example, the Owner has failed to provide the funding necessary for the Hotel to comply with Marriott's brand standards for guest room internet speed and bandwidth.  Marriott raised this problem to the Owner on several occasions, noting that the Hotel ranks 360th out of 364 Marriott Hotels for internet speed and reliability.  Guests have raised this problem as well.  One guest noted in a review that their "guest room internet poor functionality is a major displeaser."  As another guest put it, "I think the most interesting thing was how bad the internet service was.  I literally could not use the wifi.  It was too slow to load even an imessage.  I found myself disconnecting from wifi all the time just so I could get my mail."

54.    The Owner's failure to invest in necessary Hotel improvements have caused a substantial loss of revenue opportunities, despite Marriott's sales and marketing efforts to increase Hotel occupancy.   In 2019 alone, these lost opportunities amounted to more than $7 million.

55.    The Owner has not hidden its reason for refusing to invest in the Hotel.  As JBG admits in its own securities filings, it views its investment in the Hotel as a means "to pursue a plan to develop a large and potentially valuable land site in a high value residential market."   It has no plans to "devote meaningful

resources" to the Hotel and will "only do so if the land development opportunity becomes the primary business plan for the asset."[3]

56.    In a September 3, 2020 Delaware court filing, PL Wardman Member LLC admits that neither it nor JBGS/CIM Wardman Owner Member, L.L.C. intends to contribute additional capital to the Hotel, including both Working Capital to fund operational expenses and much-needed capital expenditures to align the Hotel with Marriott standards.  *See PL Wardman Member, LLC v. JBGS/Company Manager, L.L.C.*, Verified Petition for Judicial Dissolution ¶ 39 (Del. Ch. Sept. 3, 2020).

### E. The Owner's Refusal to Fund Working Capital in an Effort to Achieve Its Ultimate Goal of Closing the Hotel.

57.    By mid-March of 2020, the COVID-19 pandemic had caused the Hotel's performance to decline substantially.  At that time, Marriott was keenly aware of how COVID-19 was affecting the hotel industry, and its cash flow projections for the Hotel showed that the Hotel would soon have insufficient funds to pay for its operations.  Based on these calculations, Marriott determined that $10 million would be reasonably necessary to satisfy the Hotel's needs for the upcoming months.  Thus, on March 16, 2020, Marriott requested that the Owner fund $10 million in Working Capital to cover the forecasted cash flow shortfall.

---

[3]    JBG    Smith    Properties,    Form    10-K    101    (2018), https://www.sec.gov/Archives/edgar/data/1689796/000168979618000004/jbgs-123117x10xk.htm.

58.    The Owner refused to provide this funding, and instead requested that Marriott suspend the Hotel's operations.

59.    Marriott closed the Hotel to guests on March 25, 2020, and Hotel operations were suspended on March 27, 2020.  Marriott, the Owner, and PacLife agreed the Hotel closure would last until May 31, 2020.

60.    Closing the Hotel temporarily, however, does not eliminate all of its expenses.  Marriott would still require funds to pay a variety of items, such as payroll and benefits for those employees who must be retained to maintain the property while it is closed, benefits for furloughed employees who otherwise would be owed severance, bills that accrued but were not yet paid before the Hotel closed, utilities, taxes, license and permit fees, repairs, maintenance, security, and costs to maintain the systems used to operate the Hotel and to prepare for its reopening.  With respect to employee-related costs, Marriott did not terminate any employees when it closed the Hotel, but the vast majority were furloughed which requires continuation of their benefits.  The alternative—terminating them—would come with even greater costs because of the Hotel's severance obligations.

61.    Notwithstanding these continuing expenses, the Owner balked at Marriott's request for Working Capital.  But on March 28, 2020, the Owner did authorize the funding of $5 million in Working Capital out of the Hotel's existing account for Furniture, Fixtures, and Equipment ("FF&E") and agreed to replenish

the FF&E funds at a later date.  Marriott, the Owner, and PacLife each signed off on the use of FF&E funds to fund Hotel operations (the "Funds Request Advance Agreement").  But Marriott advised the Owner that those funds would not come close to meeting all of the Hotel's needs.  Accordingly, the parties agreed that Marriott retained the right to request additional Working Capital pursuant to the terms of the Management Agreement, and that the Owner would "fund the requested amounts into the Operating Account within 10 days or exercise its rights herein."

62.    By the end of April, Marriott had applied the $5 million in FF&E-reserve funding towards the Hotel's Working Capital needs. Most of these funds were used to pay Hotel employee expenses and taxes for March and April, thus requiring additional funds for May. Marriott's cash flow forecast showed that $1 million was reasonably necessary to satisfy the Hotel's needs for the month of May.  Marriott therefore requested that the Owner fund an additional $1 million in Working Capital.  It made these requests via phone, email, and in a formal letter dated May 15, 2020.  Marriott requested that the Owner pay these funds by May 27, 2020. Marriott's May 15 letter also notified the Owner that it was in default of its obligation to pay funds due under the Management Agreement.

63.    The Owner refused to pay the $1 million requested for May, although the Management Agreement required it to do so.  Instead, the Owner conditioned

payment on Marriott's agreement to, among other things, permanently close the Hotel, use all of the funds the Owner provided to facilitate the closure of the Hotel, and grant the Owner additional approval rights over payments made to Union employees.

64.    Marriott did not accede to the Owner's demands, none of which were consistent with the terms of the Management Agreement.    Instead, Marriott reminded the Owner of its obligation under the Management Agreement to provide funds necessary to cover cash shortfalls and its responsibility for all debts and liabilities of the Hotel.   It also reminded the Owner that failure to provide the Working Capital requested would leave insufficient funds to pay the Hotel's expenses.

65.    Because the Owner refused to provide Working Capital, Marriott advanced its own funds to pay Hotel expenses for May.

66.    Marriott's cash flow forecast showed that $1.5 million was reasonably necessary to satisfy the Hotel's needs for the month of June.   Thus, in mid-May, Marriott requested that the Owner fund $1.5 million in Working Capital by May 29, 2020, to cover the forecasted shortfall.   Marriott reiterated this request in several communications, including letters dated May 20, 2020 and May 22, 2020.

67.    Weeks later, the Owner responded to these letters by refusing to fund the requested Working Capital for June.

68.    Because the Owner refused to provide Working Capital, Marriott advanced its own funds to pay Hotel expenses for June.[4]

69.    On June 25, 2020, Marriott issued a funds request for July. It notified the Owner that its cash flow forecast showed that there would be insufficient funds to operate the Hotel in accordance with the Management Agreement's requirements, and that $1.3 million in Working Capital would be necessary to cover the forecasted shortfalls for July. Marriott requested that the Owner provide these funds by July 5, 2020.

70.    The Owner refused to pay the $1.3 million requested for July.

71.    Because the Owner refused to provide Working Capital, Marriott advanced its own funds to pay Hotel expenses for July.

72.    On July 24, 2020, Marriott issued yet another funds request for August and September. It notified the Owner that its cash flow forecast showed that there would be insufficient funds to operate the Hotel in accordance with the Management Agreement's requirements and $2.7 million in Working Capital would be necessary to cover the forecasted shortfalls through September. Marriott requested that the Owner provide these funds by August 3, 2020.

---

[4] The Owner did, however, authorize Marriott to pay limited June union benefits from the FF&E Reserve account.

73.     On the same day, Marriott reminded the Owner of Marriott's unfulfilled requests to fund Working Capital for May, June, and July, totaling $3.8 million.

74.     The Owner responded on July 31 by refusing to fund the $3.8 million in past-due Working Capital or the $2.7 million in Working Capital for August and September.

75.     Because the Owner refused to provide Working Capital, Marriott advanced its own funds to pay Hotel expenses for August. By this point, Marriott had advanced millions of dollars of its own funds to pay Hotel expenses that are exclusively the Owner's responsibility under the Management Agreement.

76.     The Owner defended its refusal to fund Working Capital by making the wholly unsubstantiated assertion that the funds Marriott requested were not "reasonably necessary to satisfy the needs of the Hotel." This defense asserts a right found nowhere in the Management Agreement for the Owner to reject Marriott's requests if the Owner unilaterally deems them unreasonable. But that is not what the parties agreed; they agreed that the Owner must fund working capital at "levels *determined by Manager* to be reasonably necessary to satisfy the needs of the Hotel."

77.     Even though the Management Agreement did not require Marriott to provide additional explanation or data supporting its funds requests, Marriott did

provide significant back-up materials supporting each request for Working Capital, including cash flow forecasts that established the Hotel's need for and proposed use of the funds.  These forecasts included information including payroll costs and detailed breakouts of other expenses.  Marriott has also offered to answer any questions or provide further support for its requests in response to Owner inquiries.

78.    The Owner has not accepted these offers, and it has not explained why it believes Marriott's forecasts do not reflect the cash needs of the Hotel or are unreasonable.

79.    Marriott's funds requests were, in fact, reasonable.  Marriott sought funding for expenses that were both authorized under the Management Agreement and reasonable for the operation and protection of the Hotel.

80.    In a September 3, 2020 Delaware court filing, PL Wardman Member, LLC—i.e., the PacLife entity that owns 80% of the Owner—admitted that there is "a need for material capital contributions" in connection with the Hotel.  *See PL Wardman Member, LLC v. JBGS/Company Manager, L.L.C.*, Verified Petition for Judicial Dissolution ¶ 2 (Del. Ch. Sept. 3, 2020).

81.    On September 4, 2020, Marriott sent the Owner a request that the Owner fund $2.2 million into the Hotel's operating account within ten days to cover additional forecasted shortfalls through October.  This request was independent of and in addition to the funds requests dated March 16, 2020 under

24

which $3.8 million remains unfunded and outstanding, and the funds request dated

July 24, 2020 under which $2.7 million remains unfunded and outstanding.

### F. PacLife Encouraged the Owner to Breach its Contractual Obligation to Fund Working Capital

82.    It has become clear why the Owner is refusing repeated Working

Capital requests in violation of the Management Agreement:  PacLife is seeking to

increase the recovery on its secured debt by forcing the Hotel to close permanently,

in violation of its obligations under both the Management Agreement and SNDA.

83.    The Owner has represented to Marriott on several occasions that the

equity in the Hotel "has no value."  In JBG's August 2020 10Q filing, it stated that

it had "reduc[ed] the net book value of [its] investment to zero."[5]

84.    Because there is no equity remaining, the value of the Hotel lies in its

debt.  PacLife, as the majority owner of the equity interest and as the lender, is

fully aware both of Owner's lack of equity and of the value of the debt.  Indeed, at

a February 2020 meeting, PacLife's representative commented on the lack of

equity value in the Hotel, acknowledging that the Owner's debt exceeded the

Hotel's value.  As a strategy to increase the recovery on that debt, PacLife and the

Owner could attempt to rid themselves of the Management Agreement, close the

Hotel permanently, and sell the Hotel unencumbered, and/or pursue alternative

---

[5] JBG Smith Properties, Form 10-Q 32 (Aug. 5, 2020), https://fintel.io/doc/sec-jbgs-10q-jbg-smith-properties-2020-august-04-18479.

uses for the property, such as converting the Hotel into multimillion-dollar condominiums. But PacLife and the Owner do not want to pay Marriott the termination fee that comes with prematurely ending the Management Agreement or bear the costs of relocating groups with existing Hotel contracts.

85.     On information and belief, PacLife therefore believes that it is in its financial interest for the Owner to shirk its obligation to fund Working Capital and thereby induce Marriott to terminate the Management Agreement without being made whole for the value of its fees or agree to a mutual termination agreement with an unreasonably low termination fee where Marriott is unreasonably forced to bear part of the Owner's contractual liability. Accordingly, PacLife is improperly using its position as equity holder to improve the recovery on its debt.

86.     PacLife has purposefully exerted pressure and influence over the Owner to refuse Marriott's requests for Working Capital. PacLife intended for this pressure to cause the Owner to breach its contractual obligation to fund Working Capital. Moreover, PacLife knew that discouraging the Owner from funding Working Capital would cause the Owner to breach its obligations under the Management Agreement. PacLife took these actions without lawful justification and in a manner that caused the Owner to breach the Management Agreement.

87.     On September 3, 2020, PL Wardman Member LLC filed a Petition in the Delaware Chancery Court seeking dissolution of the Owner and the

appointment of a liquidating trustee to oversee the winding up of the Owner. *See PL Wardman Member, LLC v. JBGS/Company Manager, L.L.C.*, Verified Petition for Judicial Dissolution ¶¶ 55-62 (Del. Ch. Sept. 3, 2020). If successful, dissolution would further PacLife's goal of recovering and increasing the value of the Owner's debt. On information and belief, PL Wardman Member LLC filed its Petition at the behest and direction of PacLife, who alone stands to gain from the dissolution and liquidation of the Owner.

88.     In May 2020, after the Owner defaulted on its contractual obligation to fund Working Capital for that month, Marriott sent a default notice to the Owner, copying PacLife.

89.     In June 2020, Marriott notified PacLife and gave it an opportunity to cure the default, as the SNDA required. Notwithstanding its representations in the SNDA that PacLife desired to provide for Marriott's continued management of the Hotel, PacLife never responded to either of these notices, and has not cured the default.

90.     PacLife has continued to discourage the Owner from funding Working Capital, and PacLife itself has also not provided Working Capital pursuant to the SNDA.

**G. Alternatively, PacLife Has Assumed the Obligations of the Owner Pursuant to the SNDA.**

91.    On information and belief, PacLife has violated the SNDA in one of the following two ways.[6]

92.    First, on information and belief, PacLife has been "act[ing]" as the Owner under the Management Agreement, including when it directed the Owner's decision not to fund Marriott's requests for Working Capital and when it directed PL Wardman Member LLC to file a petition in Delaware Chancery Court to dissolve the Owner.

93.    Once PacLife began acting as Owner under the Management Agreement, PacLife had an obligation under the SNDA to "act in a manner that is commercially reasonable and pursuant to the provisions of the Management Agreement." SNDA at 5.

94.    PacLife breached its duty to "act in a manner that is commercially reasonable and pursuant to the provisions of the Management Agreement." Specifically, PacLife has directed the decision not to fund Marriott's request for Working Capital in violation of the Management Agreement.

95.    Second, on information and belief, PacLife "Foreclosed" on the Owner's mortgage when it exercised control over the Owner to direct the Owner's decision not to fund Marriott's request for Working Capital and/or when it directed

---

[6] Allegations that PacLife assumed the Owner's obligations pursuant to the SNDA (PacLife's breach of contract) are pled in the alternative to allegations that PacLife encouraged the Owner to breach the Management Agreement (PacLife's tortious interference with contract). In addition, the two ways in which PacLife assumed the Owner's obligations pursuant to the SNDA are pled in the alternative to each other.

PL Wardman Member LLC to file a petition in Delaware Chancery Court to dissolve the Owner. PacLife's actions constituted a "Foreclosure" under the SNDA because PacLife took control of the Hotel. SNDA at 3.

96.     PacLife subsequently breached its obligations that arise in the event of a Foreclosure under the SNDA. Specifically, by failing to fund Marriott's requests for Working Capital, PacLife breached its obligations to "recognize [Marriott's] rights under the Management Agreement"; refrain from "disturb[ing Marriott] in its right to manage and operate the Hotel pursuant to the provisions of the Management Agreement"; and "assume all obligations of [the Owner] under the Management Agreement," that continue or arise after the date of Foreclosure, other than the Owner's duty to pay Base Management or Incentive Management fees unpaid as of the Foreclosure Date. SNDA at 4-6, 10.

97.     The duty to fund Working Capital is a continuing obligation of the Owner under the Management Agreement.

**H. The Owner's and PacLife's Refusals to Fund Working Capital Have Caused Marriott to Incur Unjustified Expenses, Damaged Marriott's Brand, and Harmed Employees and the Local Economy.**

98.     The Owner's and PacLife's actions have caused—and continue to cause—Marriott to incur substantial harm and liabilities in connection with its operation of the Hotel.

99.    During each month the Hotel has remained closed, Marriott and its affiliates have had to cover approximately $1.5 million per month in expenses. As noted, these payments cover costs that are the Owner's responsibility under the Management Agreement, including payroll, benefits for the Hotel's 500+ Union employees, taxes, security, license and permit fees, utilities, repairs, maintenance, and accounts payable.

100.    Because of the Owner's failure to fund Working Capital, the Hotel's accounts have lacked sufficient funds to pay utility and vendor bills for basic needs of the Hotel building and services such as water treatment and internet service critical for connectivity of the Hotel's engineering systems and servers, among other things. Vendors are currently threatening to engage third-party bill collectors to recover those unpaid expenses.

101.    Because of the Owner's failure to fund Working Capital, Marriott has been unable to pay membership dues to Destination DC, which markets the hotel to potential customers. This has affected and will continue to affect the Hotel's ability to attract business going forward.

102.    The Owner's and PacLife's refusals to fund Working Capital have not only caused Marriott to incur these expenses, but they have also damaged the value of Marriott's brand. The name on the Hotel is "Marriott," so it is Marriott that suffers reputational and brand damage when the Hotel fails to pay vendors,

perform contracts, and honor other obligations. In the eyes of vendors, *Marriott* is refusing to pay their past-due invoices. In the eyes of the public, *Marriott* is seeking to close this iconic Hotel. These negative associations with the Marriott brand cause Marriott reputational harm and financial harm.

103. Permanent closure of the Hotel would further damage the value of Marriott's brand. When hotels unexpectedly exit the system, it causes Marriott to breach contracts with vendors, groups, and companies (among others), risking significant reputational harm (in addition to potentially significant financial harm).

104. The Owner's and PacLife's refusals to fund Working Capital also have severe consequences for the Hotel's employees and local industry during this global pandemic. The Hotel has over 500 employees, some of whom have worked at the Hotel for decades. The Working Capital the Owner and PacLife have refused to pay is the source of their salaries and benefits, and permanent closure of the Hotel would eliminate their jobs.

105. The Owner's and PacLife's refusals to fund Working Capital have amplified the uncertainty they had already created regarding the Hotel's long-term future. This uncertainty is particularly damaging to Marriott in light of the Hotel's reliance on large groups. To attract and retain business from these groups, Marriott must earn their confidence that the Hotel is not about to permanently close. Conventions and other gatherings at the Hotel are planned years in advance, in part

31

to allow event organizers the time to choose and book catering services and other vendors, and to provide adequate notice to guests. But in refusing to fund Working Capital, the Owner and PacLife have forced Marriott to signal that the Hotel may well remain closed forever. Indeed, the Owner's and PacLife's failure to fund the Hotel's operations caused Marriott to notify employees that the Hotel may cease operations in the coming months, and this notice has been reported in the media.[7]

## CLAIMS FOR RELIEF

### Count I: Breach of Contract Against Owner

106.    Marriott incorporates the foregoing allegations as if fully set forth herein.

107.    At all relevant times, Marriott and the Owner had a valid contractual relationship under the Management Agreement.

108.    The Management Agreement obliged the Owner to fund Marriott's requests for Working Capital so long as the requests were for "levels determined by [Marriott] to be reasonably necessary to satisfy the needs of the Hotel…."

---

[7] *See, e.g.*, NPR, *D.C. Tourism Officials Remain Hopeful Despite 'Depressing' State of Hotel Industry* (July 1, 2020), https://www.npr.org/local/305/2020/07/01/885946426/d-c-tourism-officials-remain-hopeful-despite-depressing-state-of-hotel-industry; WTOPnews, *Marriott Wardman Park May Close for Good* (June 24, 2020), https://wtop.com/business-finance/2020/06/marriott-wardman-park-may-close-for-good; ABC7 WJLA, *Union to Employees: Marriott Wardman Park Hotel May Close After Storied, 102-Year Run* (June 23, 2020), https://wjla.com/news/local/union-to-employees-marriott-wardman-park-hotel-may-close-after-storied-102-year-run.

109. Marriott's requests for Working Capital sought funds at levels determined by Marriott to be reasonably necessary to pay the obligations of the Hotel.

110. Despite the Owner's contractual obligation to do so, the Owner has refused to fund Marriott's requests for Working Capital.

111. Marriott has continued to perform its obligations under the Management Agreement.

112. The Owner's refusal to fund Working Capital is a breach of the Management Agreement that has caused Marriott to incur millions of dollars in expenses. Those and additional expenses will continue to accrue so long as the Owner continues to be in breach of its obligation to fund Working Capital for the Hotel.

113. Marriott also is suffering reputational and brand damage from the Owner's refusal to fund Working Capital, which cannot be quantified and compensated by money damages. Marriott therefore has no monetary remedy at law for this damage to its brand and reputation.

**Count II: Tortious Interference with Contract Against PacLife**

114. Marriott incorporates the foregoing allegations as if fully set forth herein.

115. At all relevant times, Marriott and the Owner had a contractual relationship under the Management Agreement.

116. The Management Agreement obliged the Owner to fund Marriott's requests for Working Capital so long as the requests were for "levels determined by [Marriott] to be reasonably necessary to satisfy the needs of the Hotel...."

117. Marriott's requests for Working Capital sought Working Capital at levels determined by Marriott to be reasonably necessary to satisfy the needs of the Hotel.

118. PacLife was aware of the Management Agreement. In fact, PacLife was a party to several contracts that discuss the Management Agreement between Marriott and the Owner. These contracts include the SNDA and the Funds Request Advance Agreement.

119. PacLife intentionally induced the Owner to breach its contractual duty to fund Working Capital. It did so by encouraging the Owner to refuse Marriott's Working Capital requests. PacLife had no lawful justification for encouraging the Owner to breach its obligation to fund Marriott's Working Capital requests.

120. PacLife's actions caused the Owner to breach its duty under the Management Agreement to fund Working Capital.

121. Marriott has suffered and is suffering damages from this refusal, including but not limited to the millions of dollars it has paid in expenses for

payroll, benefits, security, license and permit fees, utilities, repairs, maintenance, and accounts payable. The Owner's breach of contract also damaged the value of Marriott's brand and reputation.

### Count III: Breach of Contract Against PacLife

122.   Marriott incorporates the foregoing allegations as if fully set forth herein.

123.   At all relevant times, PacLife had a valid contractual relationship with Marriott under the SNDA.

124.   When PacLife made the decision and/or directed the Owner as to how to respond to Marriott's Working Capital requests and/or when PacLife directed its affiliate to seek dissolution of the Owner in Delaware, PacLife was acting as the Owner under the Management Agreement.

125.   The SNDA specifically requires that PacLife, when acting as the Owner under the Management Agreement, to "act … pursuant to the provisions" of the Management Agreement, including the Owner's obligation to fund Working Capital in exchange for Marriott's management and operation of the Hotel.

126.   Alternatively, when PacLife took control of the Owner and directed the Owner's response and/or decision not to fund Marriott's Working Capital requests and/or when PacLife directed its affiliate to seek dissolution of the Owner

in Delaware, a Foreclosure took place as defined in the SNDA. PacLife therefore became the Subsequent Owner of the Hotel under the SNDA.

127. The SNDA specifically required that PacLife, upon becoming the Subsequent Owner under the SNDA, assume the Owner's obligations under the Management Agreement, including the Owner's obligation to fund Working Capital.

128. Upon PacLife becoming the Subsequent Owner under the SNDA following the Foreclosure, as defined by the SNDA, Marriott and PacLife had a valid contractual relationship under the Management Agreement.

129. Marriott has continued to perform all of its obligations to the Owner under the Management Agreement, and thus has incurred expenses for managing and operating the Hotel.

130. PacLife has refused Marriott's requests for Working Capital, despite PacLife's obligation under the SNDA and Management Agreement to fund Working Capital in the amounts Marriott requested.

131. Marriott continues to incur expenses for managing and operating the Hotel, and will do so for the duration of the Management Agreement.

132. PacLife's refusal to fund Working Capital is a breach of the SNDA and the Management Agreement that has thus far caused Marriott to incur millions of dollars in expenses.

133.    Marriott also is suffering reputational and brand damage from PacLife's refusal to fund Working Capital, which cannot be quantified and compensated by money damages.    Marriott therefore has no monetary remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Marriott respectfully requests that this Court enter judgment:

1.    Declaring that the Owner breached the Management Agreement;

2.    Declaring that PacLife tortiously interfered with the Owner's performance of its obligations under the Management Agreement;

3.    Declaring that PacLife breached the SNDA and the Management Agreement;

4.    Ordering specific performance of the Owner's obligation under the Management Agreement to fund Working Capital in the amounts Marriott requested, plus interest;

5.    Ordering injunctive relief compelling PacLife to comply with the SNDA and barring it from tortiously interfering with the Management Agreement;

6.    Awarding Marriott damages, including but not limited to:

4.    Ordering specific performance of the Owner's obligation under the Management Agreement to fund Working Capital in the amounts Marriott requested, plus interest;

5.    Ordering injunctive relief compelling PacLife to comply with the SNDA and barring it from tortiously interfering with the Management Agreement;

6.    Awarding Marriott damages, including but not limited to:

   a. All Hotel expenses Marriott has paid as a result of the Owner's non-payment of Working Capital and any other unpaid costs and fees, plus interest;

   b. All costs Marriott incurred in seeking Working Capital funding prior to the commencement of this litigation;

7.    Awarding Marriott its reasonable litigation expenses, costs, and attorneys' fees; and

8.    Awarding such further relief as law and equity may require.


Dated: September 8, 2020                    Respectfully submitted,

                                           By: _____
                                           Lindsay Harrison*
                                           Kali Bracey*
                                           Jessica Ring Amunson (Client Protection Fund ID No. 0412140024)
                                           JENNER & BLOCK LLP

Dated: September 8, 2020

Respectfully submitted,

By: _____

Lindsay Harrison*
Kali Bracey*
Jessica Ring Amunson (Client
Protection Fund ID No.
0412140024)
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
jamunson@jenner.com


* *Pro hac vice* forthcoming

## CERTIFICATION OF ADMISSION TO PRACTICE

I hereby certify that I am admitted to practice law in the State of Maryland.


Dated: September 8, 2020

Respectfully submitted,

By: _____

Jessica Ring Amunson
(Client Protection Fund ID No.
0412140024)
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
jamunson@jenner.com