**EXHIBIT B**

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| MARRIOTT HOTEL SERVICES, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | Case No. 483406-V |
| WARDMAN HOTEL OWNER, L.L.C., *et al.* | * | Track VI: |
| | * | The Honorable Ronald B. Rubin |
| Defendants. | * | |
| | * | |

## COUNTER-PLAINTIFF WARDMAN HOTEL OWNER, L.L.C.'S COUNTERCLAIM AND DEMAND FOR JURY TRIAL

Defendant/Counter-Plaintiff Wardman Hotel Owner, L.L.C. ("Owner" or "Defendant"), by and through its undersigned counsel, as and for its counterclaim against Plaintiff/Counterclaim Defendant Marriott Hotel Services, Inc. ("Marriott" or "Plaintiff"), states and asserts as follows:

### NATURE OF COUNTERCLAIM

1.     Under the last decade of Marriott Hotel Services, Inc.'s ("Marriott" or "Plaintiff") stewardship of the Washington Marriott Wardman Park (the "Hotel"), the Hotel net operating income has dropped from $24.77 million in 2010 to $5.02 million in 2018, **an 80% drop**.

2.     The reasons for this precipitous decline were the subject of constant complaints from Owner, the owner of the Hotel. Among other things, although the Hotel has long been positioned as a convention hotel, deriving substantial revenue from group business such as large conference and conventions, Marriott has been funneling premium group bookings to its other more recently opened Marriott-managed and owned properties in the D.C. area, while using the Hotel as a dumping ground for far less profitable budget-oriented groups. At the same time, Marriott is unwilling or unable to replace these lost group revenues with traditional overnight, or "transient" bookings, instead over-relying on online travel agencies such as Expedia or

booking.com, which charge high commissions for each reservation, significantly reducing the Hotel's profitability.

3.      Even with these depressed revenues, Marriott has also let costs at the Hotel spiral out of control.   The Hotel's expenses significantly exceed those of its competitors, including inflated labor costs well in excess of the agreed collective bargaining agreement ("CBA") levels.

4.      By all measures, Marriott's management of the Hotel has been an abject failure, as the Hotel has suffered from consistent and substantial declines in revenue, while enduring ever-increasing operational costs.

5.      Then, at the outset of the COVID-19 pandemic, Marriott exacerbated their failures by attempting to take advantage of the pandemic to shore up its own corporate accounts – baselessly demanding that Owner fund tens of millions of dollars in working capital – and initially refusing to temporarily close the hotel, in disregard for both the health and safety of the employees and guests as well as the financial stability of the Hotel.

6.      In light of these material breaches of the Second Amended and Restated Management Agreement, dated as of July 1, 2005 (the "HMA"), Owner served Marriott with a notice of default dated June 11, 2020 (the "Notice of Default").

7.      Marriott's continuing material failures and contractual breaches have cost Owner, and Owner is entitled to recover, millions of dollars in damages.

## PARTIES

8.      Owner is a limited liability company organized under the laws of Delaware with its principal place of business at c/o JDecker & Company, 5035 Riverview Road, NW, Atlanta, Georgia.  Owner owns the Hotel located in Woodley Park, Washington, D.C., presently known as the Washington Marriott Wardman Park.

2

9. Upon information and belief, Marriott is a corporation organized under the laws of Delaware with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland. Upon information and belief, Marriott is engaged in the business of managing and operating hotels.

## FACTUAL ALLEGATIONS

### A. The Hotel and the HMA

10. Owner is the owner of the property known as the Washington Marriott Wardman Park, a convention hotel located in Woodley Park, Washington, D.C.

11. When Owner acquired the Hotel in 2005, Owner and Marriott entered into the HMA, dated as of July 1, 2005. Pursuant to the HMA, Owner entrusted Marriott with the management and operation of the Hotel.

12. Pursuant to the negotiated terms of the HMA, Marriott has broad discretion "in all matters relating to the management and operation of the Hotel," including all employment decisions, account, marketing and promoting the Hotel. (HMA § 1.02(A).)

13. At the same time, Marriott agreed to "act as a reasonable and prudent operator of the Hotel" and "be responsible for the proper and efficient operation of the Hotel." (HMA § 1.02(B).)

14. Pursuant to the HMA, Marriott is required to, among other things and subject to the aforementioned performance standard, "[a]rrange for and supervise public relations and advertising, prepare marketing plans, and make available to the Hotel the benefits of various marketing programs in use in the Marriott System as they may exist from time to time[.]" (HMA § 1.02(A)(5).)

15. Marriott's compensation is calculated from gross revenues before costs and expenses are deducted. (HMA §§ 3.01; 12.01.).

16.     While the parties contemplated that revenues from bookings would cover the operational expenses of the Hotel, the HMA provides that Owner shall "advance any additional funds necessary to maintain Working Capital at levels determined by Manager to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require consistent with the Annual Operating Projection or as a result of 'unforeseen circumstances'[.]". (HMA § 4.05.).

17.     Any request by Marriott for working capital from Owner must be (1) "reasonably necessary" to satisfy the Hotel's needs, (2) consistent with the annual budget, and (3) consistent with Marriott's standard of performance.  (HMA §§ 1.02(B), 4.04, 4.05.).

18.     In an Event of Default, as defined in the HMA, the non-defaulting party may exercise prescribed remedies, including, but not limited to, terminating the HMA and instituting a legal proceeding.  (HMA §§ 9.02, 9.03.).

19.     In relevant part, one such "Event of Default" includes:

The failure of either party to perform, keep or fulfill any of the [] covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after the defaulting party's receipt of written notice from the non-defaulting party of said failure. Upon the occurrence of any Default by either party as described under this Section 9.01.E, said Default shall be deemed an 'Event of Default' under this Agreement if the defaulting party fails to cure the Default within thirty (30) days after receipt of written notice from the non-defaulting party demanding such cure, or, if the Default is such that it cannot reasonably be cured within said thirty (30) day period of time, if the defaulting party fails to commence the cure of such Default within said thirty (30) day period of time or thereafter fails to diligently pursue such efforts to completion.

(HMA § 9.01(E).)

4

## C.    **Marriott's Pre-Pandemic Breaches of Its Contractual Obligations**

20.    Over the last decade, well before the COVID-19 pandemic upended the Hotel's operations and the hospitality industry more broadly, under Marriott's management the Hotel languished relative to its peers.

21.    From 2010 to 2018 alone, the Hotel's net operating income plunged from $24.77 million to $5.02 million, an 80% drop.

22.    In fact, in 2018, the Hotel's net operating income was less than debt service owed under Owner's mortgage.

23.    Alarmingly, this decline is not correlated to a similar decline in Gross Revenues, which remained largely flat since 2013 until the pandemic-necessitated Hotel closure.

24.    As explained below, Marriott repeatedly failed to live up to its required standards of performance and to fulfill its contractual obligations as set forth in the HMA, causing this consistent and material decline in the Hotel's performance.

25.    The Hotel is designed to cater to and attract group business, and historically has derived the substantial portion of its revenue from large group events.

26.    However, since 2011, the Hotel has attracted less and less group business, and today the group mix now significantly trails its competitors.  At peak, the Hotel had 225,000 group room nights annually, and now routinely fails to achieve 200,000 group room nights.

27.    The Hotel has not only attracted less group business, but the groups that Marriott is booking are less profitable.  For instance, since 2013 the Group Revenue Per Available Room Index declined by over 15% as a result of the groups booked at the Hotel by Marriott spending less than other "premium" groups on other items, such as food and beverage and/or catering.

28.    The central reason for this decline is that Marriott is no longer booking premium

5

groups for the Hotel.  Instead, Marriott directs premium groups to other Marriott-managed and owner properties in the D.C. area.

29.     In 2012, Marriott's affiliate acquired the Gaylord Hotels brand and began to manage the 2000-room Gaylord National Resort & Convention Center in Washington, D.C.'s National Harbor.

30.     In 2014, Marriott's affiliate opened the 1100-room Marriott Marquis Washington, D.C., which has since been labeled as Marriott's "flagship" in D.C.

31.     Upon information and belief, an affiliate of Marriott is a part owner of the Marriott Marquis.

32.     Following these two events, Marriott has actively promoted these two hotels for premium group events and conventions over, and at the expense of, the Hotel.

33.     Not only does this lead to less total group room nights on an annualized basis, including valuable "in the year for the year" bookings, but as illustrated by a comparison of the Hotel's performance against its direct competitors, Marriott's decision to move away from premium groups severely impacts the Hotel's food and beverage, banquet, and catering performance as well.

34.     For example, in 2018, a direct competitor with virtually the same product and group-focused business model achieved $41.5 million in F&B revenues (and F&B departmental profit of nearly $13 million), while the Hotel achieved only $36.1 million in F&B revenues (and departmental profit of $2 million) over the same period.

35.     The bottom line is that the Hotel's direct competitors are earning more F&B revenues, and spending less to obtain those revenues, than the Hotel.  This is because premium groups spend on banquet/catering, while the lower quality groups Marriott is relegating to the

6

Hotel do not.

36.    Marriott's failure to secure premium groups is further exacerbated by its failures in other ways. Marriott has been unable (or unwilling) to replace these group bookings with traditional overnight bookings. Instead of securing either group or traditional overnight reservations itself, Marriott over-relies on online travel agencies such as Expedia or booking.com, which charge a high commission for each reservation, further hurting profitability.

37.    In other words, Marriott is unable to do its own job, and then forces Owner to pay both Marriott and a third-party travel agent for a reservation that will not make the Hotel profitable.

38.    While revenue has continued to decline, Marriott has failed to reasonably enact cost controls to account for the change in the nature of the business being booked at the Hotel. The Hotel's operational costs, most notably the labor and F&B expenses, are completely out of line with the revenue generated by the Hotel.

39.    For example, the Hotel's labor structure has plagued its profitability for years. The Hotel has problems with overstaffing that Marriott has scarcely ever attempted to address in discussions with the Union.

40.    Specifically, the union footprint (staffing levels, work rules, past practices) at the Hotel are significantly above market. Though Owner identified CBA-related savings opportunities of $5.5-$7.5 million annually, Marriott has been unwilling to engage with the Union out of concerns, upon information and belief, that it may negatively impact Marriott's broader union relations.

41.    This misalignment of interests violates Marriott's obligation to act as a reasonable and prudent operator, as well as its fiduciary obligations to Owner, and seriously negatively impacts the Hotel.

7

42.      Marriott has also failed to reasonably and prudently monitor compliance with the CBAs. For example, Marriott has permitted employees to gain benefits well in excess of the agreed CBA benefit levels, including some employees attaining accrued vacation time of more than a year (far in excess of the maximum accrual allotment provided for under the Union's own bargained-for package). The impact of these failures continue to lead to significant excess, reasonably avoidable costs to Owner.

43.      In addition to staffing problems, costs that could more easily be controlled are not being addressed. When compared to its direct competitors, the Hotel's expenses exceed its competitors on virtually every measure (including A&G expenses, operations, and utilities).

44.      Ironically, the Hotel trails its competitors in marketing spend, one of the only expense line items for which there is a directly traceable return on investment.

45.      Separately, as detailed above, F&B profit has significantly declined, but Marriott has done little to stem this troubling trend.

46.      Marriott has offered no sensible solutions to the Hotel's declining performance. In response to a discussion where Owner identified a number of key performance failures by Marriott responsible for the Hotel's underperformance, Marriott unreasonably proposed that Owner fund an additional capital investment of **$82 million**, projecting that doing so would increase the Hotel's net operating income to $15-16 million annually, an incremental performance increase that not only fails to provide a justifiable return on such an investment, but in any event is overly optimistic and unrealistic.

47.      Marriott's failure to address its own performance failures in its proposal evidences that Marriott has no intention of addressing the root causes of the Hotel's underperformance.

48.      Marriott's indifference to the bottom-line performance of the Hotel results in

8

numerous avoidable expenses, which are to Owner's sole detriment, as Marriott is paid based upon top-line gross revenues.

**D.**    **Marriott Serves Unreasonable Working Capital Demands Amid the Pandemic**

49.    The COVID-19 pandemic halted global travel and resulted in the closure of countless travel and hospitality-related businesses.

50.    The Hotel was severely impacted by the COVID-19 pandemic.  By late March 2020, the Hotel suspended operations. The Hotel remains closed as of the date of these Counterclaims.

51.    On or about March 16, 2020, just as large parts of the country were shutting down as a result of the COVID-19 pandemic, Marriott served the first of several working capital demands.

52.    Without any legitimate basis or justification, Marriott demanded that Owner fund $10 million of working capital.

53.    This figure was not only many times more than what was historically necessary to operate the Hotel, it was contradicted by Marriott's own on-property employees who admitted the actual amount needed was no more $2.5 million.

54.    In support of its demand for $10 million, Marriott prepared a forecast for the financial performance of the Hotel.  According to the forecast, Marriott would refuse to close the Hotel during the raging pandemic, despite the danger it would cause to the Hotel staff, and despite revenues being completely decimated.

55.    This, according to Marriott's forecast, would cause the Hotel to lose over $19.5 million in 2020 alone, while Marriott would earn approximately $1.5 million in management fees.

115866\000001\4811-7814-1652.v1

56.     Upon information and belief, the forecast accompanying the March 16 request was the first of its kind, and Marriott had never prepared a working capital forecast for the Hotel.

57.     After Owner raised serious concerns with the forecast, including Marriott's attempts to keep the Hotel open during the pandemic, on or about March 18 Marriott prepared and submitted a revised cash flow forecast.

58.     Under the revised forecast, Marriott projected the Hotel would need approximately $6.3 million in working capital through the entirety 2020.

59.     Despite this revised forecast, Marriott did not revise its request for $10 million.

60.     A few days later, on or about March 22, Marriott prepared and provided to Owner yet another revised cash flow forecast.  Under that revised forecast, Marriott projected the Hotel would need approximately $5.26 million in working capital through the entirety of 2020.

61.     Marriott still did not revise its request for $10 million.

62.     On or about March 19, 2020, Owner informed Marriott that it would not fund $10 million as Marriott did not show such amount was "reasonably necessary to satisfy the needs of the Hotel" as required by the HMA.

63.     Despite repeated requests for information as to the basis for the call for working capital, Marriott provided none.  For example, the working capital requests did not identify the projected uses of the requested funding, such as (i) the vendors to be paid and the reasons for same, (ii) the group deposits and advanced deposits to be refunded and the reasons for same, and (iii) all projected payroll and other expenses and the reasons for same.

64.     Nevertheless, Owner agreed that Marriott could use $2.5 million out of the Hotel's Furniture, Fixtures and Equipment ("FF&E") account for working capital needs.

115866\000001\4811-7814-1652.v1

65.     Additionally, Owner agreed with Marriott's suggestion that the Hotel be closed due to the raging pandemic and asked that the closure be effectuated.

66.     Instead of closing the Hotel as agreed, Marriott held Owner hostage by conditioning closure of the Hotel on Owner's funding of Marriott's full $10 million working capital request.

67.     This tactic caused the Hotel to continue to incur unnecessary expenses and needlessly risked exposing Hotel employees and guests to the COVID-19 virus.

68.     The parties thereafter agreed that the Hotel would close, and Owner authorized the release of $5 million of the FF&E account to be used as working capital.

69.     The Hotel was closed on March 25, 2020, and two days later, the Hotel ceased all operations save for a limited staff to handle building maintenance and other basic functions.

70.     During this time, the parties also engaged in a series of discussions about terminating the HMA.

71.     Yet, Marriott's demands for "working capital" payments from Owner were far from over.

72.     As the market for travel evaporated and hotels shuttered, Marriott engaged in a continuing pattern of making unnecessary, unreasonable and capricious demands for funds to "operate" the Hotel.

73.     Marriott issued additional working capital demands in May 2020 (for $1 million), May 26, 2020 (for $1.5 million), June 25, 2020 (for $1.3 million), July 24, 2020 (for $2.7 million) and September 4, 2020 (for $2.2 million).

11

74.     Owner rejected each demand because they were sent expressly in furtherance of Marriott's baseless March 16 demand for $10 million, they were procedurally improper under the HMA, and/or because Marriott failed to demonstrate that the funds were reasonably necessary for the operation of Owner's shuttered, inoperative Hotel.

75.     Upon information and belief, the purpose of Marriott's working capital demands was not to provide for the maintenance of Owner's Hotel during the global COVID-19 pandemic, but was rather to shore up Marriott's own cash reserves.

76.     Upon information and belief, Marriott sent identical "working capital" demands to many of its managed hotel owners. Those demands are contained in virtually identical form letters with only the addressee and amount demanded changing from letter to letter. Similarly, each demand Marriott sent to Owner is identical, save for the amount demanded. Instead of individually assessing the differing needs at each of its owners' hotels, Marriott is reflexively demanding money from hotel owners under the guise of "working capital" payments using the same carbon copy form letter.

77.     On or about December 4, 2020, Marriott issued an additional working capital demand of $2 million.

78.     Upon information and belief, a significant portion of the funds demanded for the December 4 working capital demand are to be used to pay liabilities incurred prior to December.

E.      **Owner Serves a Default Notice on Marriott**

79.     On June 11, 2020, Owner served Marriott with the Notice of Default.

80.     As set forth in the Notice of Default, Marriott breached the HMA not only by making repeated improper demands for working capital payments, but also due to its chronic, fundamental management failures.

81.    Marriott's breaches include, *inter alia*, (1) its failure to act as a reasonable and prudent operator and having regarding for the status of the Hotel in, among other things, establishing sales and marketing strategies; (2) its failure to be responsible for the proper and efficient operation of the Hotel through its labor practices; and (3) its imposition of unnecessary and unproductive costs on Owner in non-labor expenses which, when compared to the Hotel's direct competitors, exceeds competitors on virtually every measure (save for marketing spend, where the Hotel trails in spending).

82.    As set forth in the Notice of Default, Marriott was required to cure its defaults on or before July 14, 2020.

83.    Marriott denied that it is in default and has failed to cure the defaults set forth in the Notice of Default.

## COUNT I
### (Breach of Contract)

84.    Owner repeats and realleges paragraphs 1 through 83 as if fully set forth herein.

85.    Owner and Marriott are parties to the valid and enforceable HMA.

86.    Owner fulfilled its obligations under the HMA, and all conditions precedent have been satisfied.

87.    Marriott breached the HMA by, among other things: (i) failing to act as a reasonable and prudent operator of the Hotel, having regard for the status of the Hotel and maintaining the System Standards; (ii) issuing to Owner improper and willfully exaggerated demands for capital; (iii) failing to establish reasonable and prudent sales and marketing strategies; (iv) imposing unnecessary and unproductive costs, including, but not limited to, labor costs; and (v) favoring its own interests over Owner's.

88.    As a direct and proximate result of Marriott's breaches, Owner has sustained

115866\000001\4811-7814-1652.v1

injuries for which compensation is sought in the form of: (i) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (ii) disgorgement of all profits earned by Marriott by virtue of the many breaches; and (iii) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its contractual duties.

89.     In addition, Owner is entitled to recover its reasonable attorneys' fees, court costs, pre- and post-judgment interest.

**WHEREFORE**, Defendant/Counter-Plaintiff Owner demands judgment in its favor as follows in an amount that exceeds Seventy-Five Thousand Dollars ($75,000.00): (i) damages in an amount to be determined at trial, plus damages continuing into the future; (ii) disgorgement of all profits earned by Marriott by virtue of the many breaches; (iii) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its fiduciary duties; (iv) attorneys' fees, court costs, pre- and post-judgment interest at the legal rate; and (v) such other and further relief as the Court deems just and proper.

**COUNT II**
**(Breach of Covenant of Good Faith and Fair Dealing)**

90.     Owner repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     Owner and Marriott are parties to the valid and enforceable HMA.

92.     Based on the acts of Marriott set forth above, Marriott has breached the duty of good faith and fair dealing imposed by the HMA.

93.     The actions of Marriott evidence a lack of good faith, including, but not limited to, issuing improper and willfully exaggerated demands for working capital, keeping the Hotel open as a tactic to force Owner to fund the improper demands for working capital, and abusing the discretion granted to it under the HMA.

94.     As a direct and proximate result of Marriott's breaches, Owner has sustained

14

injuries for which compensation is sought in the form of: (i) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (ii) disgorgement of all profits earned by Marriott by virtue of the many breaches; and (iii) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its contractual and fiduciary duties.

95.     In addition, Owner is entitled to recover its reasonable attorneys' fees, court costs, pre- and post-judgment interest.

**WHEREFORE**, Defendant/Counter-Plaintiff Owner demands judgment in its favor in an amount that exceeds Seventy-Five Thousand Dollars ($75,000.00), as follows: (i) damages in an amount to be determined at trial, plus damages continuing into the future; (ii) disgorgement of all profits earned by Marriott by virtue of the many breaches; (iii) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its fiduciary duties; (iv) attorneys' fees, court costs, pre- and post-judgment interest at the legal rate; and (v) such other and further relief as the Court deems just and proper.

## COUNT III
### (Breach of Fiduciary Duty)

96.     Owner repeats and realleges paragraphs 1 through 95 as if fully set forth herein.

97.     By virtue of Owner's entrustment of the management of the Hotel and the handling of revenues, operating funds and process related thereto, a fiduciary relationship was created and continues to exist between the parties.

98.     Marriott owes Owner the highest fiduciary obligations and utmost duties of loyalty, good faith, fair dealing and full disclosure by virtue of the fiduciary relationship between the parties.  Marriott was and is obliged as a fiduciary not to promote its interests at the expense of and to the detriment of Owner.

15

99.     By reason of Marriott's intentional, knowing and wrongful acts, including but not limited to promoting its own interests to the detriment of Owner, Marriott breached its fiduciary duties to Owner.

100.    As a direct and proximate result of Marriott's breaches, Owner has sustained injuries for which compensation is sought in the form of: (i) compensatory damages in an amount to be proven at trial, plus damages continuing into the future; (ii) punitive damages in the amount of at least three times the amount of compensatory damages; (iii) disgorgement of all profits earned by Marriott by virtue of the many breaches; and (iv) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its fiduciary duties.

101.    In addition, Owner is entitled to recover its reasonable attorneys' fees, court costs, pre- and post-judgment interest.

**WHEREFORE**, Defendant/Counter-Plaintiff Owner demands judgment in its favor in an amount that exceeds Seventy-Five Thousand Dollars ($75,000.00) as follows: (i) damages in an amount to be determined at trial, plus damages continuing into the future; (ii) punitive damages in the amount of at least three times the amount of compensatory damages; (iii) disgorgement of all profits earned by Marriott by virtue of the many breaches; (iv) disgorgement of all fees paid by Owner to Marriott during the period that Marriott has been in flagrant breach of its fiduciary duties; (iv) attorneys' fees, court costs, pre- and post-judgment interest at the legal rate; and (v) such other and further relief as the Court deems just and proper.

## COUNT IV
### (Claim for Attorneys' Fees and Costs Pursuant to Maryland Rule 2-705)

102.    Owner repeats and realleges paragraphs 1 through 101 as if fully set forth herein.

103.    In the event that Owner prevails in this action, Owner also seeks an award of reasonable attorneys' fees and costs pursuant to Section 11.24 of the HMA.

16

104.    Section 11.24 of the HMA provides:

In any litigation, action, claim, suit, arbitration, or proceeding brought by the parties with respect to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party expenses (including reasonable attorneys' fees) incurred at the pretrial, trial or appellate level.

105.    Pursuant to Maryland Rule 2-705(b), "[a] party who seeks attorneys' fees from another party pursuant to this Rule shall include a claim for such fees in the party's initial pleading [counterclaim] ..."

106.    Owner has incurred, and will continue to incur, substantial attorneys' fees, costs and expenses in defending the claims set forth in the Complaint and prosecuting the Counterclaim, all resulting from Marriott's breaches of the HMA, which will be supported by evidence at the appropriate time.

**WHEREFORE**, in the event that Defendant/Counter-Plaintiff Wardman Hotel Owner, L.L.C. prevails in this action, Defendant/Counter-Plaintiff requests that the Court enter judgment in its favor in an amount that exceeds Seventy-Five Thousand Dollars ($75,000.00) and against Plaintiff/Counter-Defendant Marriott Hotel Services, Inc. in an amount as determined to be reasonable attorneys' fees and costs incurred by Defendant/Counter-Plaintiff in this action pursuant to Maryland Rule 2-705 and such other and further relief as the court may claim to be just, necessary and proper under the circumstances.

115866\000001\4811-7814-1652.v1

Respectfully submitted,


/s/ J. Stephen McAuliffe, III
J. STEPHEN McAULIFFE, III
CFP No. 8812160089
ROSALYN TANG
CFP No. 0612130387
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, Maryland 20850
Telephone: (301) 762-1600
smcauliffe@milesstockbridge.com
rtang@milesstockbridge.com

/s/ Todd E. Soloway
TODD E. SOLOWAY
BRYAN T. MOHLER
ITAI Y. RAZ
Pryor Cashman LLP
7 Times Square
New York, New York 11036
Telephone: (212) 421-4100
tsoloway@pryorcashman.com
bmohler@pryorcashman.com


*Attorneys for Defendant/Counter-Plaintiff*
*Wardman Hotel Owner, LLC*


## DEMAND FOR JURY TRIAL

Pursuant to Maryland Rule 2-325, Counter-Plaintiff Wardman Hotel Owner, LLC hereby

demands a trial by jury of all issues triable of right by a jury.

/s/ Rosalyn Tang
ROSALYN TANG
CFP No. 0612130387


18

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 16th day of December 2020, a copy of the foregoing was

e-mailed and mailed first class to:

John M. Quinn, Colleen Coffman, Heather S. Koontz
Ethridge Quinn Kemp Rowan & Hartinger
33 Wood Lane
Rockville, MD 20850
jmq@eqlawyers.com
ccc@eqlawyers.com
hsk@eqlawyers.com

Jessica Ring Amunson, Lindsay Harrison, Tassity S. Johnson
Jenner & Block LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
jamunson@jenner.com
lharrison@jenner.com
tjohnson@jenner.com

Paul B. Rietema
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
PRietema@jenner.com

Grant T. Stein, David A. Wender, Brian D. Frey
Alston & Bird LLP
1201 West Peachtree Street
One Atlantic Center
Atlanta, GA 30309
grant.stein@alston.com
david.wender@alston.com
brian.frey@alston.com

*/s/ Rosalyn Tang*
ROSALYN TANG
CFP No. 0612130387

19